UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VORCELIA OLIPHANT,<br>        Plaintiff,<br><br>        v.<br><br>ROBERT VILLANO, et al.,<br>        Defendants. | No. 3:07cv1435 (SRU) |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This case arises from the 2006 investigation and arrest of the brother of Vorcelia Oliphant, the plaintiff. The defendants are Robert Villano and Mark Sheppard, officers with the Hamden Police Department.[1] On October 4, 2010, the defendants filed a motion for summary judgment.[2] The plaintiff requested numerous extensions to respond. I held a hearing on the motion on April 28, 2011. On that date, I informed the plaintiff that she had until May 15, 2011 to respond, and would be granted no further extensions. Although the plaintiff did not file her response until May 17, 2011, I will consider her submission.[3] I will also consider an affidavit submitted by the plaintiff on June 7, 2011 (doc. #161), a statement of material facts submitted by the plaintiff on July 7, 2011 (doc. #165), a second memorandum in opposition to the motion for

---

[1] In her third amended complaint, filed September 17, 2009, Oliphant also named sixteen other defendants. On August 24, 2009, however, I dismissed with prejudice the claims against all defendants except Villano and Sheppard. Therefore, the claims against Craig Appleby, William Onofrio, Venditto (no first name given), Town of Hamden, M. Sigmon, Kevin Samperi, Thomas Wydra, City of New Haven, Peterson (no first name given), Joyner (no first name given), Levy (no first name given), M. Davis, Jr., Howze (no first name given), Smith (no first name given), New Haven Police Department, and Unnamed Defendants (I/O New Haven Police Department) are again dismissed.

[2] The defendants' motion primarily dealt with the Fourth Amendment claims against the defendants. Oliphant's opposition covers all claims set forth in her complaint, and I will therefore consider whether summary judgment should be granted on all counts. Fed. R. Civ. P. 56(f).

[3] In the plaintiff's opposition to the defendants' motion for summary judgment, she states that she is cross-moving for summary judgment.

summary judgment submitted on July 7, 2011 (doc. #166), and additional evidence submitted on July 7, 2011 (doc. #167).

For the reasons stated below, Sheppard's motion for summary judgment is granted. Villano's motion for summary judgment is granted in part and denied in part. Oliphant's motion for summary judgment is denied.

## I. Background

Oliphant is the owner of four rental units at 130 Cherry Ann Street in New Haven, Connecticut. Aff. of Vorcelia Olphant in Support of Summ. J. Mot. Signs around the building say "no trespassing" and "private property." *Id.* At all relevant times the plaintiff's brother resided in one of the rental units.

On September 25, 2006,[4] around 12:45 a.m., Villano was called to the Ebony Lounge in Hamden to investigate an assault. Defs.' Exs. A at ¶ 5; C at 1; D at 3.[5] At the Ebony Lounge he spoke with Rhonda Dixon, who claimed to have been punched in the eye by her boyfriend (and the plaintiff's brother), Anthony Oliphant ("Anthony"). Defs.' Exs. A at ¶¶ 6-7; C at 1; D at 3. At the time Dixon's right eye was extremely swollen, and there was blood under her eyelid. Defs.' Exs. A at ¶ 7; D at 3.

Dixon then accompanied Villano and Officers Sigmon and Venditto to Cherry Ann Street, to show Villano where Anthony lived. Defs.' Exs. A at ¶ 9; C at 2, D at 4. Once there,

---

[4] The defendants state that the Hamden police went to the plaintiff's residence on September 25, 26, and 27. Anthony Oliphant has stated that they went to the residence on September 24, 25, and 26. The actual date has no bearing on the disposition of the motions for summary judgment.
[5] Oliphant argues that the defendants' affidavits and exhibits should be stricken, because they were made and/or filed in bad faith. Oliphant does not give any evidence to support that statement, and thus the court will consider the proffered affidavits and exhibits. Oliphant also argues that the affidavits contain inadmissible hearsay. Any statements attributed to Rhonda Dixon are offered not for the truth of the matter asserted, but instead for their effect on the listener, and are therefore not hearsay.

2

Dixon directed the officers to a second floor apartment at 130 Cherry Ann Street.[6] Defs.' Ex. A at ¶ 10.

When Villano and Dixon arrived at the apartment building, Anthony stuck his head out of one of the upstairs windows and began to yell obscenities at Dixon and the officers. *Id*. at ¶ 12-14; Defs.' Exs. C at 2, D at 4; Pl.'s Ex. E at 56. Villano requested that Anthony step outside, but Anthony refused, and responded that the officers should return with a warrant. Defs.' Ex. A at ¶¶ 16-17. The officers left after approximately fifteen minutes. *Id*. at ¶ 18.

The next night, September 26, 2006, after midnight, Villano returned to the apartment complex with several other officers. *Id*. at ¶ 22. Villano approached the rear of the building, where Anthony's private entrance was. *Id*. at ¶ 23. He states that at no point did he kick or cause damage to the door. *Id*. at ¶ 24. Anthony filed a citizen report that gives a different account of what happened. He alleges that the officers "kick[ed] and bang[ed]" on the back door, and "illegally attempt[ed] to gain access to [Anthony's] residence using keys" provided by Dixon. Defs.' Ex. H at 2. Anthony also states that Villano screamed "Anthony Oliphant is a piece of s***, Anthony Oliphant isn't s***, Anthony Oliphant punched his girlfriend in the eye for no reason." *Id*. Anthony states that Villano caused "severe damage" to the back door. *Id*.

After Villano approached the door, Anthony stuck his head out of his window, and Villano requested that he come outside. Defs.' Ex. A at ¶¶ 25-26. Anthony declined. *Id*. at ¶ 26. The officers left after approximately fifteen minutes. *Id*. at ¶ 27.

The next night, September 27, 2006, after midnight, Villano again returned to Anthony's apartment. *Id*. at ¶ 28. Upon arrival, he saw a group of people, later identified as Dixon and three to four of her siblings. *Id*. at ¶ 29. When Villano arrived, Anthony and Dixon's group

---

[6] According to Villano, he was informed by dispatch that the residence was a Hamden address. He later learned that it was, in fact, a New Haven address. Defs.' Exs. A at ¶ 15; D at 4.

were screaming at each other. *Id*. at ¶¶ 29-30. Shortly thereafter, the New Haven Police Department ("NHPD") arrived in response to a 911 call from Anthony. *Id*. at ¶ 31; Defs.' Ex. E at 3. NHPD informed Villano that the apartment building was in New Haven; that fact was then confirmed by Hamden's dispatch. Defs.' Ex. A at ¶¶ 33-34. Sheppard did not go to 130 Cherry Ann Street on September 25, 26, or 27, 2006. Defs.' Ex. B at ¶ 5.

Villano applied for an arrest warrant for Anthony on September 27, 2006. Defs.' Ex. A at ¶ 38. He received that warrant on September 28, 2006. *Id*. at ¶ 39. Anthony was arrested by members of the Hamden Police Department, including Sheppard, on October 6, 2006. *Id*. at ¶ 40; Defs.' Exs. B at ¶ 7; L.

In October 2006, Anthony filed a civilian complaint against Villano. Defs.' Exs. H, I. The officers assigned to investigate the allegations determined that there was insufficient evidence to sustain the complaint. Defs.' Exs. J, K.

The plaintiff filed her first complaint on September 26, 2007. Since then, she has amended her complaint two additional times, most recently on September 17, 2009. Her most recent complaint alleges violations of: (1) 42 U.S.C. § 1983, (2) the First Amendment, (3) the Fourth Amendment, (4) 42 U.S.C. § 1982, (5) the Fifth Amendment, and (6) 42 U.S.C. § 1985.

## II.  Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the

4

light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of her pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48.  To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof at trial, then summary judgment is appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if she can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

### III. Discussion

#### A. Defendant Sheppard

There is no evidence to suggest that Sheppard was involved with any activities that may have harmed the plaintiff. His only involvement appears to be that he participated in Anthony's arrest. Therefore, Sheppard's motion for summary judgment is granted.

#### B. Defendant Villano

##### 1. *First Amendment Claim (count 2)*

Oliphant claims that Villano violated her First Amendment rights by causing renters to move out of her rental units. 3d Amend. Compl. at ¶ 17; *see also* Pl.'s Ex. U at 78-79 (testimony of Cathy Williams that she moved from 130 Cherry Ann Street after Anthony's arrest because she was afraid of the Hamden police). Individuals who rent their property for commercial reasons have no First Amendment right to that relationship, however, *Brady v. Town of Colchester*, 863 F.2d 205, 217 (2d Cir. 1988), and Oliphant's argument fails.

Oliphant also argues at length that the defendants retaliated against Anthony for filing a citizen complaint against Villano. Opp'n to Defs.' Mot. for Summ. J. at 30-31. Even if that were true, it would be a violation of Anthony's First Amendment rights, not Oliphant's.

6

Therefore, Villano's motion for summary judgment on count two is granted.  Oliphant's motion for summary judgment on count two is denied.

    2.  *42 U.S.C. § 1982 (count 4)*

Oliphant also claims that Villano has violated 42 U.S.C. § 1982.  Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  "Section 1982 applies to 'official action of t[he] kind that would prevent [non-whites] from exercising the same property rights as whites . . . [,] that depreciated the value of property owned by [non-white] citizens . . . [, or] hampered [non-whites] on the use of their property.'"  *Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991) (quoting *Memphis v. Greene*, 451 U.S. 100, 123 (1981)).  Here, Oliphant appears to suggest that her property rights were violated when Villano came to her apartment complex and "elicited fear" in her renters, causing them to move elsewhere.  3d Amend. Compl. at ¶¶ 16-20.

A section 1982 claim requires proof of intentional discrimination.  *Rivera*, 928 F.2d at 608.  Oliphant has alleged that "Hamden police have a practice and policy of harassing African-Americans, males in particular."  3d Amend. Compl. at ¶ 18.  As evidence of her claims, Oliphant has submitted newspaper articles from 2000 and 2001 that describe alleged discrimination and racial profiling by Hamden officers.  Pl.'s Exs. H, Q.  Those articles are insufficient to prove that Villano, in 2006, acted with discrimination when he investigated Oliphant's brother at her property.  *See Rivera*, 928 F.2d at 608 (affirming dismissal of section 1982 claim where plaintiffs' homes were searched by police, but there was merely speculation that only apartments belonging to Hispanic residents were targeted).  Oliphant has also submitted an affidavit in which she alleges that she "talked with individuals at the Hamden/New Haven line

7

in November who informed me that the Hamden Police has a custom and practice of brutality and harassment of citizens on the town line but particularly, black males at the Hamden/New Haven town line and in Hamden." Doc. #161 at ¶ 10. Those statements are inadmissible hearsay, and may not be considered as evidence. Therefore, Villano's motion for summary judgment on count four is granted. Oliphant's motion for summary judgment on that count is denied.

      3.  *42 U.S.C. § 1985 (count 6)*

In order to succeed on a claim under 42 U.S.C. § 1985(3), a plaintiff must prove:

> (1) [A] conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen.

*Iqbal v. Hasty*, 490 F.3d 143, 176 (2d Cir. 2007), *rev'd on other grounds, Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). "In addition, the conspiracy must be motived by some class-based animus." *Id.* at 70.

Oliphant's conspiracy allegations are conclusory. She alleges that "Hamden police together and with other civilians conspired against plaintiff's property, making loud threats and violent acts against plaintiff's property by trying to break in main entry and common door entrances," 3d Amend. Compl. at ¶ 23, and that "[a]ll the officers and the civilian non residents acted in concert together in violation of plaintiff's constitutional rights." *Id.* at ¶ 25. Oliphant is presumably alleging that the Dixons and Villano conspired together, but she offers no evidence of such a conspiracy. Moreover, she offers no evidence that any such conspiracy was "for the purpose of depriving any person . . . of the equal protection of the laws," or that it was motivated by class-based animus. Thus, Villano's motion for summary judgment on count six is granted. Oliphant's motion for summary judgment on count six is denied.

8

4. *Fifth Amendment Claim (count 5)*

Oliphant alleges that she suffered a takings violation when Villano kicked and damaged her door. "[A] property owner has not suffered a violation of the [Takings] Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985). The requirement that a plaintiff first exhaust available state procedures is a requirement for both physical and regulatory takings claims. *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 380 (2d Cir. 1995).

Thus, in order for a plaintiff to bring a takings claim in federal court, that plaintiff must either first attempt to obtain just compensation through a Connecticut state court proceeding or other regulatory process, or demonstrate that the Connecticut procedures for obtaining compensation are inadequate or unavailable. In Connecticut, one procedure for obtaining compensation is to seek it from the State under Article First, Section 11, of the Connecticut Constitution. *Id.*; *Silva v. Town of Monroe*, No. 3:07cv1246, 2010 WL 582611, at *12 (D. Conn. Feb. 16, 2010).

On June 27, 2012, I issued an order to show cause directing Oliphant to produce evidence that she had attempted to obtain compensation from the State, or that she had not so attempted because the Connecticut procedures for obtaining compensation are inadequate or unavailable. In response, Oliphant filed a reply stating that she had filed a complaint with the Hamden Police Department, and filed a case in state court. *Oliphant v. Sheppard, et al.*, NNH-CV09-5032328-S. She did not include her complaint in that case, so it is not possible for me to determine whether Oliphant sought to obtain compensation in that case under Article First, Section 11, of the Connecticut Constitution.

In any case, Oliphant's takings claim must fail. A takings claim does not arise when property is damaged pursuant to a police search. *Johnson v. Manitowoc Cnty.*, 635 F.3d 331, 336 (7th Cir. 2011). That is because in such a case, the property has been damaged pursuant to the government's exercise of its police power, not its eminent domain power. *Id.*; *see also Bennis v. Michigan*, 516 U.S. 442, 452 (1996); *Brisbane v. Milano*, No. 3:08cv1328, 2010 WL 3000975, *6 (D. Conn. July 27, 2010), *aff'd*, 443 F. App'x. 593 (2d Cir. Oct. 19, 2011). If Villano acted outside of the scope of his police power when he damaged Oliphant's door, the proper remedy is the Fourth Amendment, not the Fifth Amendment. As a result, Villano's motion for summary judgment on count five is granted, and Oliphant's motion for summary judgment on that count is denied.

5. *Fourth Amendment Claim (count 3)*

Oliphant states that Villano has violated her Fourth Amendment rights. Two of Oliphant's allegations could theoretically give rise to a Fourth Amendment violation: (1) Villano's entrance onto her property, and (2) the damage Villano caused to Oliphant's property.[7]

<u>Entrance onto Oliphant's Curtilage</u>

Oliphant first argues that Villano violated her Fourth Amendment rights when he entered her property in order to speak to her brother. Oliphant has submitted evidence that Villano went to her back door, on the back stoop, and in the back yard. Pl.'s Opp'n Exs. N at 180; O at 41; U at 51, 53. Oliphant has also introduced evidence indicating that her yard is fenced, and several

---

[7] Oliphant also argues that Villano violated the Fourth Amendment by falsely arresting her brother, Anthony. As I have already ruled repeatedly in this case, any argument to that effect must be brought by Anthony, not by the plaintiff.

10

no trespassing signs are posted around the yard.[8]  Oliphant Aff. in Opp'n to Summ. J. at ¶ 4.  At the rear of Oliphant's property is a dense forest that is impassible to human traffic.  *Id.* at ¶ 7.

Although Villano did not enter Oliphant's home, Oliphant argues that he did enter her curtilage.  "Curtilage" is "[t]he land or yard adjoining a house, usually within an enclosure."  Black's Law Dictionary 441 (9th ed. 2009).  "It has long been established that curtilage receives the same protections under the Fourth Amendment as the home itself."  *Broculio v. Proulx*, 478 F. Supp. 2d 297, 302 (D. Conn. 2007), *aff'd*, 324 F. App'x. 32 (2d Cir. Apr. 21, 2009).

The Supreme Court has laid out four factors courts can use in defining the extent of a home's curtilage: (1) the proximity of the area claimed to be curtilage of the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.  *United States v. Dunn*, 480 U.S. 294, 301 (1987).  These factors are not dispositive, but instead are merely "analytical tools" used to determine whether the "area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  *Id.*

A reasonable jury, applying the factors presented in *Dunn*, could find that Villano entered Oliphant's curtilage.  The evidence, read in the light most favorable to the non-moving party, indicates that Villano went into Oliphant's fenced back yard, and up to her stoop.  At the back of Oliphant's yard was a forest that obscured the view of the property.  A fenced back yard can be within the curtilage of someone's home, and a jury could find that Oliphant had a reasonable

---

[8] In support of her argument, Oliphant submitted several photographs of her property.  The photographs provided to the court were of poor quality, and it was impossible to determine what they were intended to depict.  On June 27, 2012, I ordered Oliphant to submit courtesy copies of the photographs to the Court and to defense counsel by July 30, 2012.  Oliphant responded that she could not produce photographs of a higher quality.  Therefore, the photographs have limited utility as evidence.

expectation of privacy within that yard.  *See Brocuglio*, 478 F. Supp. 2d 297 (denying motion for reconsideration on ruling granting summary judgment for plaintiff where police had entered fenced back yard).

The cases Villano cites to the contrary are distinguishable.  In *United States v. Titemore*, the Second Circuit held that the defendant had not violated the plaintiff's Fourth Amendment rights by walking across a front lawn that was not completely enclosed to a primary entrance of the home.  437 F.3d  251 (2d Cir. 2006).  Similarly, in *Esmont v. City of New York*, the district court granted summary judgment for the defendants because the plaintiff did not have Fourth Amendment protection to "[u]nobstructed, open areas in front of a residence."  371 F. Supp. 2d 202, 212 (E.D.N.Y. 2005) (emphasis added).  Here, however, the plaintiff has presented evidence that Villano entered an enclosed area in the rear of the residence.

This case is also unlike *United States v. Raines*, 243 F.3d 419 (8th Cir. 2001).  In that case, the Eighth Circuit held that there was no Fourth Amendment violation when a police officer, attempting to serve civil process, entered the back yard after receiving no answer at the front door.  Although a "makeshift fence of debris" encircled the property, there was a ten-foot wide opening in the fence, that had no barrier across the front, and did not contain a "no trespassing" sign.  *Id.* at 421.  Given those circumstances, the Court held that the officer had committed a "limited intrusion," which was justified because he was attempting to serve civil process.  Here, however, it is unclear whether there was any opening in the fence around Oliphant's back yard.[9]  Oliphant has also testified that she had several "no trespassing" signs displayed around the area.

---

[9] *See also United States v. Hammett*, 236 F.3d 1054 (9th Cir. 2001) (officers did not violate Fourth Amendment when they encircled the plaintiff's house after receiving no answer at the front door; nothing in the opinion indicates that the back of the home was fenced); *United States*

12

Villano correctly notes that "[i]n a modern urban multifamily apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control." *United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996) (internal citations omitted).  That does not mean that multifamily residences are devoid of Fourth Amendment protection, though.  Intrusions into common areas in multifamily residences "do not constitute a Fourth Amendment search if that area is readily accessible to the public, but do if the area in question has been sufficiently secured so as to give the tenants a justified expectation of privacy in that place."  1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* 570 (4th ed. 2004); *see also Connecticut v. Reddick*, 207 Conn. 323 (1988) (plaintiff had reasonable expectation of privacy in basement of two-family house).  A fenced back yard is an area "where a tenant might expect other tenants and invited guests but would not expect deliverymen, salesmen, mailmen, policemen or trespassers." *Reddick*, 207 Conn. at 332.  It "is not an area readily accessible to the public or to any significant number of people.  It is not a means of ingress or egress as is a common hallway that invites traffic and, consequently, the prying eyes and ears of strangers." *Id.* at 332-33 (internal citations omitted).  Consequently, a jury could find from the evidence presented that the tenants at 130 Cherry Ann Street had a justified expectation of privacy in the fenced back yard.

Villano next argues that Oliphant had no expectation of privacy in the back yard because she was not a tenant of the dwelling, but was instead the landlord.  As an initial matter, it must be

---

*v. Daoust*, 916 F.2d 757 (1st Cir. 1990) (officers did not violate Fourth Amendment when they went to back of house looking for plaintiff after receiving no answer at front door; again, nothing in the opinion indicates that the back of the home was fenced); *United States v. Thomas*, No. 3:02cr72, 2003 WL 21993462 (D. Conn. Apr. 28, 2003) (officers did not violate Fourth Amendment when videotaped plaintiff's front yard and porch area from across the street; although chain link fence ran across front yard, it did not shield front yard from view, and plaintiff had no expectation of privacy).

13

noted that individuals do have Fourth Amendment protection in their business premises. *See v. City of Seattle*, 387 U.S. 541, 543 (1967). In any case, I need not conduct that analysis, because Oliphant has alleged facts sufficient for a jury to find that she was a resident of the apartment house in question. Oliphant not only alleges that she owned the building, but also that she "maintained her living space, clothing and special effects at the apartment with her brother Anthony Oliphant." Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 23.

Finally, Villano argues that, even if he did commit a Fourth Amendment violation, he should be entitled to qualified immunity. At the time of the conduct in question, however, it was settled that curtilage was entitled to Fourth Amendment protections, even in a multifamily dwelling. *Reddick*, 207 Conn. 323. Material questions of fact exist regarding whether reasonable officers would have understood Villano's conduct violated clearly established law. Therefore, Villano is not entitled to summary judgment on the basis of qualified immunity.

Damage to Property

Even if a jury finds that Villano was lawfully on Oliphant's property, he may still have violated the Fourth Amendment if he destroyed her property while there.

> The reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out, whether pursuant to a warrant or under "exigent circumstances."

*Ayeni v. Mottola*, 35 F.3d 680, 684 (2d Cir. 1994) (internal quotations omitted), *abrogated on other ground by Wilson v. Layne*, 526 U.S. 603 (1999). "Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search not subject to suppression." *United States v. Ramirez*, 523 U.S. 65, 71 (1998).

14

Here, the plaintiff has presented evidence that Villano, in the course of looking for Anthony, caused severe damage to her back door.  If true, that could constitute a violation of the Fourth Amendment.  That inquiry, however, is one that is reserved for the jury.  "'Whether the police officers' actions were unreasonable or malicious is a question of fact that cannot be resolved on a motion for summary judgment.'"  *Ochoa v. City of West Haven*, No. 3:08cv24, 2011 WL 3267705, at *6 (D. Conn. July 29, 2011) (quoting *Notice v. Koshes*, 386 F. Supp. 2d 23, 27 (D. Conn. 2005)).  Thus, Villano's motion for summary judgment on count three is denied.

Oliphant's motion for summary judgment on count three is also denied.  Before the Fourth Amendment claim can be resolved, a jury must resolve several factual inquiries, including how secluded Oliphant's back yard was at the time of the incident, whether Villano damaged Oliphant's property, and whether any destruction of property was sufficiently unreasonable to constitute a violation of the Fourth Amendment.

## IV.  Conclusion

For the reasons stated above, the defendants' motion for summary judgment, doc. #137, is **granted in part** and **denied in part**.  Oliphant's motion for summary judgment, doc. #156, is **denied**.

It is so ordered.

Dated at Bridgeport, Connecticut, this 16th day of August 2012.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge